# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00533-CV

---

**GS Texas Ventures, LLC, Appellant**

**v.**

**Public Utility Commission of Texas, Appellee**

---

### FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-17-001526, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant GS Texas Ventures, LLC (GSTV), filed an application seeking to be designated an eligible telecommunications carrier (ETC) and an eligible telecommunications provider (ETP). An administrative law judge (ALJ) heard the application and issued a proposal for decision recommending that the application be approved, but in its final order, the Public Utility Commission of Texas denied GSTV's application. GSTV sought judicial review, the trial court affirmed the Commission's denial of the application, and GSTV filed this appeal. As explained below, we affirm the trial court's order affirming the denial of GSTV's application.

## STATUTORY FRAMEWORK

"One of the goals of the Federal Communications Commission ('FCC') is to ensure that all Americans have access to affordable phone service," and "[a]s a result, Texas and the federal government have established universal service funds to award subsidies to companies

providing service to low income and rural, high-cost areas." *Public Util. Comm'n v. Texas Tel. Ass'n*, 163 S.W.3d 204, 207 (Tex. App.—Austin 2005, no pet.); *see In re Southwestern Bell Tel. Co.*, 235 S.W.3d 619, 621-22 (Tex. 2007) (orig. proceeding) ("Universal service—that is, 'adequate and efficient telecommunications service' available to all citizens at 'just, fair, and reasonable rates'—has long been a policy objective of our state and national governments." (quoting Tex. Util. Code § 52.001)).  This appeal concerns Texas's subsidy fund—the Texas Universal Service Fund, which is governed by the Public Utility Regulatory Act (PURA), *see* Tex. Util. Code §§ 56.021-.033, and subchapter P of 16 Texas Administrative Code, chapter 26, *see* 16 Tex. Admin. Code §§ 26.401-.424 (2019) (Public Util. Comm'n of Tex., Texas Universal Service Fund).

Subsidies paid under state and federal funds are only available to a carrier that is designated as an ETC or ETP after meeting the requirements set out in applicable state and federal statutes and rules. *Texas Tel. Ass'n*, 163 S.W.3d at 207.  Under federal law, a carrier may be designated an ETC if it provides "the services that are supported by Federal universal service support mechanisms under section 254(c)[1] of this title, either using its own facilities or a combination of its own facilities and resale of another carrier's services." 47 U.S.C. § 214(e)(1)(A).  The FCC issued rules to implement section 254, *see generally* 47 C.F.R. §§ 54.1-.1403 (2019) (Part 54, titled "Universal Service"), which provide that a state commission "shall" designate as an ETC a carrier that offers the services required under Subpart

---

[1] Section 254, titled "Universal service," sets out the principles of universal service, 47 U.S.C. § 254, and subsection (c) states that universal service is "an evolving level of telecommunications services" that shall be reviewed periodically by the FCC, taking into account technological advances and the extent to which certain telecommunications services "are essential to education, public health, or public safety"; have "been subscribed to by a substantial majority of residential customers"; are being publicly deployed by telecommunications carriers; and "are consistent with the public interest, convenience, and necessity," *id*. § 254(c).

B[2] through "its own facilities or a combination of its own facilities and resale of another carrier's services,"[3] *id*. § 54.201(b), (d)(1).  "Supported services" were originally defined in Subpart B as nine specific services, including "voice grade access to the public switched network," single party service, access to emergency and operator services, and access to directory assistance. *Universal Service*, 62 Fed. Reg. 32862, 32949-50 (June 17, 2007) (former version of 47 C.F.R. § 54.101).  In 2011, Subpart B was amended by the "*USF Reform Order*"[4] to provide that "[v]oice telephony services and broadband service shall be supported by federal universal service support mechanisms"  and to define "eligible voice telephony services" as follows:

> Eligible voice telephony services must provide voice grade access to the public switched network or its functional equivalent; minutes of use for local service provided at no additional charge to end users; access to the emergency services . . .; and toll limitation services. . . .

47 C.F.R. § 54.101(a).

---

[2] Subpart B is composed entirely of section 54.101.  *See* 47 C.F.R. § 54.101 (2019) (Supported services for rural, insular and high cost areas).

[3] The carrier must also advertise the services' availability.  *Id*. § 54.201(d)(2).

[4] The *USF Reform Order* states:

> [T]o promote technological neutrality while ensuring that our new approach does not result in lower quality offerings, we amend section 54.101 of the Commission rules to specify that the functionalities of eligible voice telephony services include voice grade access to the public switched network or its functional equivalent; minutes of use for local service provided at no additional charge to end users; toll limitation to qualifying low-income consumers; and access to the emergency services 911 and enhanced 911 services to the extent the local government in an eligible carrier's service area has implemented 911 or enhanced 911 systems.

*In re Connect America Fund*, Report & Order & Further Notice of Proposed Rule-Making, 26 F.C.C.R. 17663, at para. 78 (Nov. 18, 2011).

The Texas Legislature thus mandated that the Commission adopt rules to govern the Fund. Tex. Util. Code §§ 56.021, .023. The Commission in turn promulgated rules governing how an entity can obtain ETP designation so as to "receive funds from the Texas Universal Service Fund," 16 Tex. Admin. Code § 26.417 (Designation as Eligible Telecommunications Providers to Receive Texas Universal Service Funds (TUSF)), and ETC designation so as to "receive support from the federal universal service fund," *id*. § 26.418 (Designation of Common Carriers as Eligible Telecommunications Carriers to Receive Federal Universal Service Funds). To be designated an ETC in a non-rural area, as GSTV seeks, the carrier must, among other things, "provide federally supported services pursuant to" Subpart B, offering "the services that are supported by the federal universal service support mechanisms under [Subpart B] either using its own facilities or a combination of its own facilities and resale of another carrier's services." *Id.* § 26.418(c)(1), (d)(1).

## FACTUAL AND PROCEDURAL BACKGROUND

GSTV sought ETC and ETP status, asserting that it would provide "home phone local exchange service to Texans with cutting-edge technology." Commission staff opposed the designation, and the matter was referred to an ALJ at the State Office of Administrative Hearings. *See* Tex. Gov't Code § 2003.049(a) (State Office of Administrative Hearings performs contested case hearings for Commission). In considering GSTV's application, the ALJ considered evidence that included testimony from two witnesses—Michael Hatfield, president of GSTV, and Liz Kayser, a Commission Section Director, both of whom submitted written testimony before the hearing and testified at the hearing with the ALJ.

4

The parties primarily disagreed about whether GSTV's proposed services would satisfy the "own-facilities" requirement.[5]  Commission staff asserted that under the 2011 *USF Reform Order*, "voice telephony service" is one service made up of four "functionalities"—voice grade access to the public switched network, local service minutes at no additional charge, emergency services, and toll limitation services—and that all four functionalities must be provided, at least in part, through GSTV's own equipment or facilities.  GSTV, on the other hand, insisted that the four requirements should be considered separate services and that it satisfies the own-facilities requirement if it provides at least one service through its own facilities.  The ALJ provided the following chart to explain the parties' positions:

|  | *USF Reform Order*'s effect on the own facilities requirement | *USF Reform Order*'s effect on whether GSTV's switch meets the own facilities requirement |
|---|---|---|
| **GSTV** | The order reduced the number of supported services *from nine to four* (including access to emergency service). | GSTV meets the requirement because its switch will be used to provide *at least one* of the supported services. |
|  | The order did not change the ruling that, to meet the requirement, a carrier need only use its facilities to provide *in whole or in part* the supported service. | In the alternative, if Staff is correct that now there is only one supported service, GSTV's switch meets the requirement because it will be used to provide *in whole or in part* that one supported service. |
| **Staff** | The order deleted five of the nine supported services and combined the other four into *one* supported service (voice telephony), which comprises four functionalities (which previously were those four supported services). | Because there is only one supported service, the "at least one" concept is now meaningless.  To meet the requirement, GSTV must use its facilities *to provide* (in whole or in part) *all four functionalities* of that service, which GSTV's switch does not do because it will not be used to provide access to emergency service. |

---

[5] Commission staff also argued that GSTV was a reseller of Commercial Mobile Radio Service (CMRS) because the wireless receivers should be considered "mobile stations." However, in its final order, the Commission did not make a definitive statement about the CMRS issue, nor do the parties make any appellate arguments related to the CMRS issue.

In his written testimony, Hatfield explained that GSTV will provide its services through a switch it has leased,[6] and that the switch will "handle customers' outbound and inbound calls and [GSTV] will have total and sole control over its leased capacity." The only Subpart B service or functionality that will not go through the switch is emergency service, which will be provided by way of a contract with Sprint. Further, GSTV will provide its customers with wireless receivers that convert wireless signals into a format compatible with landline telephones. The receivers are "fixed, non-mobile devices that would ordinarily remain in one location," they are owned by GSTV, and customers will have to return them if they cancel GSTV's service. Hatfield's written testimony only touched on the installation of the receivers by saying that the equipment would be installed in customers' homes by GSTV service technicians, who would "go to the customer's home, disconnect the old telephone company loop from the customer premises wiring, and install the tabletop wireless receiver into the home's existing wiring" using a standard landline telephone jack, called an RJ11 jack.

In his live testimony before the ALJ, Hatfield was asked about the installation of the wireless receivers. He said:

> The current process is we send a technician out to the home. It's important that they disconnect the house from the traditional network that's outside. They will go in, you know, at the customer's discretion to select their room, an existing RJ-11 jack. They will mount the device on the wall. They will hardwire it into the electrical loop of the house, and at the same time if it's possible they'll hardwire it into the telecom loop of the house through the RJ-11 jack.

Hatfield testified that it was a "fire hazard to plug these devices into the telephone loop while they're still connected to the wireline loop." He also explained that there would be "safety

---

[6] The parties do not dispute that the leased switch is GSTV's "own" equipment.

considerations" if a customer tried to disconnect the device, saying, "It's hardwired into the electrical loop. Unless [the customer] had some knowledge of electricity and some training in electricity or some training along those lines or some knowledge they could stand to be severely injured in an electrical situation." Hatfield acknowledged that the devices could function without being hardwired but said that GSTV's contracts with its customers would require the receivers to be hardwired and would bar customers from attempting to move them.[7] He agreed that in responding to staff inquiries, GSTV had not said that the devices would be hardwired.

In her written testimony, Kayser focused on whether GSTV was a CRMS reseller and on whether GSTV was required to provide all four functionalities or services through its own equipment. She did not address the installation of the receivers, other than to note that the wireless receivers "can be taken to different locations" and contain battery backup—facts that relate to the CRMS issue because they are relevant to whether the receivers are "mobile" devices. Keyser stated that although GSTV had said in its application that it "would provide the supported services by utilizing its own facilities, including switching equipment, in combination with facilities furnished by" other providers, in response to discovery requests it instead had "stated that it would be providing service through reselling the wireless service of the underlying wireless carrier and leasing switch capacity from a third party." She also testified that in the *USF Reform Order*, "[t]he FCC further stated that only carriers that provide voice telephone as defined under [Subpart B, 47 C.F.R. § 54.101(a)] as amended *using their own facilities* will be deemed to meet the requirements of section 214(e)(1)." Kayser testified that GSTV's application should be denied because it will not provide emergency services using its own facilities.

---

[7] The user manuals provided by GSTV indicate that the receivers are plugged into an electrical outlet like any other electrical device.

In her live testimony, Kayser again focused on her view of Subpart B's amendments, testifying that Subpart B initially specified "nine supported services," but that after the 2011 amendments, "there is one supported service" that "has to be able to do four things." She said "the 'in whole' or 'in part' language in the FCC orders remains" because although a carrier must provide all four required functionalities "[s]omewhere along the way," it does not have to provide the service through its own facilities "in its entirety." She explained that although emergency services did not have to go through GSTV's leased switch, those services had to be provided "at some point on your network." Kayser did not address the issue of the receivers being hardwired.

In the proposal for decision, the ALJ stated that Hatfield had said that the receivers would be hardwired into the homes' telecommunications wiring "if possible," and found "this evidence too amorphous to conclude that GSTV proved it will **hardwire the wireless receiver into the home's telecommunications wiring**." She further stated that GSTV had "established that it will hardwire the wireless receiver into the home's electrical loop." The ALJ noted that GSTV had not mentioned the electrical hardwiring in Hatfield's written testimony or in its responses to staff requests for information and stated that it was "understandable" if Commission Staff was frustrated at the "moving target" of GSTV's proposed method of installation. However, she said, "Staff learned in discovery that GSTV had **considered** such a plan," although GSTV did not indicate that it would "actually implement such measures," and thus had "sufficient opportunity to address it."

As for the amendments to Subpart B, the ALJ disagreed with the Commission Staff's interpretation and instead defined the "own facilities requirement" as "the requirement that an ETC or ETP provide **at least** one supported service **in whole or in part** using either its

8

own facilities [GSTV's leased switch] or a combination of its own facilities and resale of another carrier's service." She determined that GSTV met that requirement as well as the other requirements for ETC designation and recommended that GSTV's ETC application be approved. The ALJ further recommended that GSTV receive the requested ETP designation, determining that its commitments were "sufficient for purposes of this case," that it had satisfied the ETP requirements, and that the designation would be consistent with the public interest.

In its final order, the Commission disagreed with the ALJ's recommendations that GSTV should receive the requested designations. The Commission concluded that GSTV's descriptions of its service "are too vague and hypothetical to satisfy its burden of proof," noting that GSTV did not provide an actual contract for the provision of emergency services. The Commission further stated, "In addition, GSTV's claims about the nature of its proposed service—especially with respect to its proposal to hardwire the wireless receivers into customer homes—changed throughout the proceeding, casting doubt on the credibility of GSTV's claims about its proposed service." The Commission also concluded that GSTV was required to provide all four functionalities through its own facilities and that because it would not provide emergency services through its switch, it did not satisfy the own-facilities test. Finally, the Commission stated that GSTV could not be designated an ETP without an ETC designation, but that even if it had satisfied all of the ETP requirements, such a designation would not be consistent with the public interest.

The Commission adopted some of the ALJ's findings of fact and conclusions of law, omitted others, and made additional findings and conclusions of its own. Among its findings were the following:

9

21. Under GSTV's proposal, for each customer starting service from GSTV, a GSTV technician would disconnect the customer's home from the traditional network facilities outside, then install GSTV's wireless receiver into an existing RJ-11 jack in the home, connecting it into the home's telecommunications inside wiring. The technician would also mount the wireless receiver on a wall and hardwire it into the home's electrical wiring.[8]

21A. GSTV first claimed that it planned to hardwire the receivers into customer homes during the redirect of GSTV witness Michael Hatfield at the hearing on the merits.

21B. GSTV did not disclose its hardwiring proposal in its application, its pre-filed testimony, or in its discovery responses.

21C. GSTV did not provide evidence of any negotiated terms for such hardwiring.

21D. GSTV did not provide evidence explaining what type of permits would be needed for such electrical work and how those permits would be obtained.

21E. GSTV did not provide evidence explaining how it would ensure that the electrical work involved in the hardwiring proposal would be performed by a licensed electrician or other appropriate personnel.

In its conclusions of law, the Commission determined:

10. GSTV has not met its burden of proof to show that its requests to be designated as an ETC and as an ETP should be granted.

10A. GSTV failed to credibly describe its proposed service technology and has not provided evidence sufficient to satisfy its burden of proof in this proceeding.

. . .

---

[8] Finding of fact 21 is the same as the ALJ's finding of fact other than the addition of the introductory phrase, "Under GSTV's proposal."

10C. GSTV's evidence of its hardwiring proposal, introduced during the hearing on the merits, is vague and not credible.

GSTV sought judicial review, and the trial court affirmed the Commission's order. GSTV then filed this appeal.

## STANDARD OF REVIEW

The Commission is empowered to change an ALJ's findings of fact or conclusions of law or vacate or modify an ALJ's order if it determines that the ALJ "did not properly apply or interpret applicable law, commission rules or policies, or prior administrative decisions" or "issued a finding of fact that is not supported by a preponderance of the evidence." Tex. Gov't Code § 2003.049(g). The Commission need not defer to the ALJ's findings and may instead "weigh the evidence anew." *Southwestern Pub. Serv. Co. v. Public Util. Comm'n*, 962 S.W.2d 207, 214 (Tex. App.—Austin 1998, pet. denied); *see Malone v. Public Util. Comm'n*, No. 03-11-00815-CV, 2013 WL 4820454, at *4 (Tex. App.—Austin Aug. 28, 2013, no pet.) (mem. op.) ("unlike the general APA rules governing agency modifications, the Commission may substitute its judgment for that of the ALJ on questions of fact"). The Commission is not "unchecked in its reevaluation of the evidence," however, and must "state in writing the specific reason and legal basis for any changes made." *Southwestern Pub. Serv. Co.*, 962 S.W.2d at 214; *see* Tex. Gov't Code § 2003.049(h) (if Commission modifies ALJ's determinations, it must "state in writing the specific reason and legal basis for its determination").

A party to an administrative proceeding before the Commission is entitled to judicial review "under the substantial evidence rule." Tex. Util. Code § 15.001. In conducting a substantial evidence review, a court may not substitute its judgment for that of the Commission "on the weight of the evidence on questions committed to" the agency's discretion. Tex. Gov't

11

Code § 2001.174. "'Substantial evidence' does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact." *Reliant Energy, Inc. v. Public Util. Comm'n*, 153 S.W.3d 174, 184 (Tex. App.—Austin 2004, pet. denied). We presume that the Commission's findings are supported by substantial evidence, and the appellant bears the burden of proving otherwise. *Id.*

We will uphold the Commission's finding "even if the evidence actually preponderates against the agency's finding so long as enough evidence suggests the agency's determination was within the bounds of reasonableness." *Id.* at 191; *Southwestern Pub. Serv. Co.*, 962 S.W.2d at 215. Further, we will sustain the Commission's order "on any legal basis shown in the record," *Public Util. Comm'n v. Southwestern Bell Tel. Co.*, 960 S.W.2d 116, 121 (Tex. App.—Austin 1997, no pet.), and must be "mindful of the rule that a reviewing court is not bound by the reasons given by an agency in its order, provided there is a valid basis for the action taken by the agency," *Pretzer v. Motor Vehicle Bd.*, 138 S.W.3d 908, 914 (Tex. 2004) (cleaned up). We may only reverse the Commission's decision if the appellant's substantial rights have been prejudiced because the administrative findings, inferences, conclusions, or decisions violate a constitutional or statutory provision, exceed the Commission's statutory authority, were made through unlawful procedure, are affected by other error of law, are "not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole," or are arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion. Tex. Gov't Code § 2001.174(2).

12

**DISCUSSION**

GSTV primarily focuses on the own-facilities requirement, contending that it carried its burden of proving that it would satisfy Subpart B's requirements. It also argues that an ETP designation would be consistent with the public interest; that the Commission did not provide sufficient explanation to support its modifications of the ALJ's findings of fact and conclusions of law and that its determinations were contrary to the evidence; and that the Commission improperly withheld certain evidence.

Despite GSTV's focus on the own-facilities requirement, the final order also stated that GSTV had not carried its burden of proof because it had provided only "vague" descriptions of its proposed services, explaining that GSTV's failure to provide information related to the hardwiring of the receivers into customers' homes cast doubt on GSTV's proposal. The Commission made several findings of fact to that effect, noting that GSTV had not explained what permits, if any, would be needed for electrical work associated with the hardwiring; how such permits would be obtained; how it "would ensure that the electrical work . . . would be performed by a licensed electrician or other appropriate personnel"; and whether it had arranged contracts for that work to be carried out. The Commission noted that GSTV did not disclose its plan to hardwire the receivers in its application, its pre-filed testimony, or its discovery responses and that the hardwiring was not mentioned until Hatfield's live testimony.

As we have noted, the Commission is authorized to reevaluate the evidence and make its own findings of fact. *Id*. § 2003.049. Under our deferential substantial-evidence review, we may not substitute our judgment for that of the Commission when it comes to the weight of the evidence on questions committed to the agency's discretion. *Id.* § 2001.174. Indeed, "the Commission has been given more control than some other agencies over the

13

ultimate disposition of its cases." *Hammack v. Public Util. Comm'n*, 131 S.W.3d 713, 723 (Tex. App.—Austin 2004, pet. denied); *see Southwestern Pub. Serv. Co.*, 962 S.W.2d at 214. When there is enough evidence to suggest that the Commission's decision was within the bounds of reasonableness, we will uphold the determination. *Reliant Energy*, 153 S.W.3d at 184. In other words, we should affirm the order if there is a valid factual or legal basis for it. *See Pretzer*, 138 S.W.3d at 914.

As we have noted, the parties' arguments in the administrative proceeding were confined almost entirely to how to interpret Subpart B and the CMRS-reseller issue (a dispute that seems to have been dropped by the Commission in its final order). The question of the receivers' installation arose in the parties' debate over whether GSTV should be considered a CMRS reseller, and the hardwiring issue was thus discussed almost entirely in that context. However, the Commission's final order did refer to the lack of explanation and evidence in its overall determination that GSTV had not carried its burden of establishing that it was capable of providing the services it claimed it would provide, noting the Commission's specific concerns about GSTV's hardwiring proposal and setting out the evidence, or lack thereof, related to the hardwiring. As original factfinder, the Commission was authorized to reweigh the evidence and draw conclusions anew, and we will not second-guess its assessment of the evidence. *See* Tex. Gov't Code §§ 2001.174, 2003.049; *Hammack*, 131 S.W.3d at 723; *Southwestern Pub. Serv. Co.*, 962 S.W.2d at 214. We have reviewed the administrative record and cannot conclude that the Commission's decision lacked a valid basis in its concerns over the hardwiring of the receivers into customers' homes. *See Pretzer*, 138 S.W.3d at 914. Instead, we can only conclude that there was sufficient evidence to suggest that the Commission's determination was within the bounds of reasonableness. *See Reliant Energy*, 153 S.W.3d at 184.

14

Because the hardwiring issue is a sufficient basis for the Commission's denial of GSTV's application, separate and apart from whether GSTV satisfied the own-facilities requirement, we need not consider GSTV's issues related to the interpretation of Subpart B, its proposal to provide emergency services through a contract with Sprint, and whether ETP status would be consistent with the public interest.[9]

We next consider GSTV's complaints about the Commission's statements in the final order related to the "credibility" of GSTV's proposal. GSTV argues that the Commission did not provide "evidence, reason, or legal authority" to support its assertions that GSTV's description of the nature of its services changed throughout the proceeding and that those changes undermined GSTV's credibility. GSTV contends that it did not "change" its proposal but instead that it provided a "fuller, more detailed, and more responsive" description in response to inquiries and suggestions during the application process. We will not, however, second-guess the Commission's determinations about the credibility and reliability of GSTV's proposal, particularly with respect to the hardwiring, which at best seems to have been mentioned briefly as a possibility before Hatfield's live testimony, testimony in which he in passing stated that GSTV intended to hardwire the receivers. The Commission is given rather broad authority to make the ultimate decisions in its cases because of the complexity of the issues presented and the agency's specialized judgment, knowledge, and experience in sorting through those issues. *See Hammack*, 131 S.W.3d at 723-24. We cannot conclude that the Commission's references to having doubts about the "credibility" of GSTV's proposal amount to reversible error.

---

[9] To obtain an ETP designation, a carrier must have an ETC designation. 16 Tex. Admin. Code § 26.417(c)(1) (2019) (Public Util. Comm'n of Tex., Designation as Eligible Telecommunications Providers to Receive Texas Universal Service Funds (TUSF)). The Commission allowed GSTV to file its application for an ETP designation contemporaneously with its application for designation as an ETC.

We now turn to GSTV's contention that the Commission did not sufficiently justify its modifications to the ALJ's findings of fact and conclusions of law. Specifically, it complains that the Commission only discussed "GSTV's burden of proof, not the ALJ's burden"; did not "identify what the burden of proof is"; did not state a "specific reason for concluding that the ALJ failed to meet its burden"; and did not state a legal basis for such a conclusion. Therefore, GSTV argues, the Commission's additions, deletions, and modifications to the ALJ's findings of fact are invalid.[10]

The Commission explained in its discussion section that GSTV had not met its burden of proof because it had not sufficiently described how it would provide the proposed services or established that it would actually be able to provide the proposed services. The Commission explained that GSTV's descriptions were "vague and hypothetical," that its "claims about the nature of its proposed service—especially with respect to its proposal to hardwire the wireless receivers into customer homes—changed throughout the proceeding," and that it did not

---

[10] In asserting that the final order insufficiently explains why the Commission diverged from the ALJ, GSTV largely focuses on the Commission's statements that GSTV had not established the actual terms of its arrangement with Sprint for the provision of emergency services. However, we have held that the lack of information about the hardwiring of the receivers provided sufficient grounds for the Commission to deny GSTV's application, separate and apart from any concerns about the provision of emergency services.

Further, we must note that GSTV produced only a draft contract and that Hatfield explained that GSTV had chosen not to "expend the necessary resources and get a proper contract" until it had "more certainty about the prospect of [ETC and ETP] designation." He also explained that GSTV's arrangement with Sprint was novel and that Sprint thus "does not have an existing . . . contract" that would apply. He testified that GSTV had asked Sprint "to provide the closest example agreement they have," and that Sprint "merely pulled some language from an existing . . . template to show to Staff." Hatfield said that GSTV and Sprint were "in the process of making all the changes that are necessary" and that there would be "new language, and some of the existing template language will go away," resulting in a final contract that "will be specifically tailored to our situation." The Commission thus had an evidentiary basis to determine that it did not know the terms of GSTV's arrangement with Sprint.

produce a final contract with Sprint so as to show how it would provide emergency services. The Commission went on to explain why it had determined that GSTV did not satisfy the own-facilities requirement, noted several specific areas in which GSTV had not provided specific and sufficient evidence,[11] and explained why it concluded that an ETP designation would not be consistent with the public interest. The Commission concluded its discussion section by stating that "large portions of the [proposal for decision] contained discussion, findings of fact, and conclusions of law" that were "not necessary to the Commission's decision" and that the Commission was therefore not adopting those portions. The Commission explained that it was adopting certain parts of the ALJ's proposal, largely to provide the factual background of the case, and specified which findings and conclusions it was deleting, adding, and modifying.

We have not found authority for the proposition that the Commission must provide line-by-line explanations in changing or deleting an ALJ's findings. Instead, the supreme court has explained:

> There is no precise form for an agency's articulation of underlying facts, and courts will not subject an agency's order to some hypertechnical standard of review. What is important is that the findings serve the overall purpose evident in the requirement that they be made—i.e., they should inform the parties and the courts of the basis for the agency's decision so that the parties may intelligently prepare an appeal and so that the courts may properly exercise their function of review.

*Goeke v. Houston Lighting & Power Co.*, 797 S.W.2d 12, 15 (Tex. 1990) (cleaned up). Viewed as a whole, the final order sufficiently explains why the Commission changed, deleted, and

---

[11] The Commission explained that GSTV had not identified specific exchanges in which it would use "unbundled network elements", a situation that would arise if a "wireless last mile is not feasible." It then went on to explain that it had concluded that voice telephony is one "single supported service" that is comprised of "four functionalities" and that an ETC must provide all four functionalities using its own facilities.

added findings and conclusions. We thus overrule GSTV's arguments related to whether the Commission provided "the specific reason and legal basis" for its changing, deleting, and adding findings of fact and conclusions of law and for its ultimate decision to deny GSTV's application. *See* Tex. Gov't Code § 2003.049(g), (h); *see also Southwestern Pub. Serv. Co. v. Public Util. Comm'n*, No. 07-17-00146-CV, 2018 WL 1977120, at *4 (Tex. App.—Amarillo Apr. 26, 2018, no pet.) (mem. op.) (discussing whether Commission sufficiently explained its departure from ALJ's recommendation); *Malone*, 2013 WL 4820454, at *3-5 (same); *City of El Paso v. Public Util. Comm'n*, 344 S.W.3d 609, 625-26 (Tex. App.—Austin 2011, no pet.) (same); *Reliant Energy*, 153 S.W.3d at 206-07 (same); *Meier Infiniti Co. v. Motor Vehicle Bd.*, 918 S.W.2d 95, 101 (Tex. App.—Austin 1996, writ denied) (noting that *Goeke* court reviewed "the entire order to determine whether the agency considered the statutory criteria" and thus "acknowledged that an agency need not make 'ultimate' findings on each statutory criterion").

Finally, GSTV argues that it was denied due process because Commission staff did not produce at the administrative level email communications alleged to be a "smoking gun." In those communications, between Kayser and Brad Ramsey of the National Association of Regulatory Commissioners, Kayser asked several questions including, "If [an ETC applicant] is only providing one of the three functions of voice telephony through its own facilities and providing the other functions through resale would the [applicant] meet the facilities requirement?" Ramsey responded initially that he "thought" the answer was "yes," then emailed with someone at the FCC, who said, "I think your answers were right." GSTV argues that Commission staff "provided false testimony, false discovery responses, and concealed" those communications, which were not produced until discovery at the trial-court level.

18

After those emails were disclosed, GSTV made the same assertions of malfeasance in its filings before the trial court. The trial court, however, did not make any determinations of misconduct or due-process violations, nor can we conclude on this record that the omission of the communications was intentional or attributable to the Commission as a decision-maker. As the Commission notes, Kayser was a witness for a party, not a decision-maker on GSTV's application. Further, we do not know why she did not disclose those emails in her discovery response, but the Commission's attorneys stated that they were "incorrectly withheld as privileged." We decline to attribute to Kayser or to the Commission itself improper motives without some evidence of misconduct rather than mistake. Finally, those communications go to the issue of whether GSTV satisfied the own-facilities requirement, and as we have stated already, the Commission had sufficient alternative grounds to deny the application. We overrule GSTV's arguments related to the failure to timely disclose Kayser's communications with Ramsey.

## CONCLUSION

We have held that the Commission had sufficient grounds on which to base its denial of GSTV's application for designation as an ETC and an ETP. We have also overruled GSTV's other arguments, related to due process and the sufficiency of the Commission's explanations for changing the ALJ's findings, conclusions, and recommendations. We therefore affirm the trial court's order affirming the Commission's final order.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Kelly and Smith

Affirmed

Filed: January 15, 2020